If we're in place for the Edwards v. CSX case, the counsel here, I will ask the judges, are you ready? Yes, Judge, we're ready. Well, thank you for the two of you for coming and being a part of this conference here. As I've said before, it's not virtual, it's real court, so you should treat it as such. I think that we'll be able to, with the technology agreeing, we're going to be able to do this just like we're in the real world. We won't shake your hands at the end, we can wave at you, and that's about the best you'll get from us today, but nonetheless, we're glad you're here. Judge Harris and Judge Quattrobonne, and your judges here, myself, Judge Wendt. So if we will, let's proceed with the appellant in this case. All right, thank you, your honors, and may it please the court, it truly is a privilege to be here. I'm Bill Cash, I represent the appellants, Jimmy Edwards, and the rest of the peer-to-peer class. And I plan to divide my argument into two halves, the third-party contract issue and the federal preemption issue. And unless the panel has any meetings on this, I intend to start with the contract question just because I think it's an easier way to introduce the facts. So in our view, there are two contracts at issue here, the 1978 tri-party agreement that was made between CSX's predecessor, the city of Wimbledon, and the drainage district, and Let me ask you a question right from the beginning, it just bugs me about this case. Why did the city of Wimbledon bring this case? I believe the city of Wimbledon didn't want to get crosswise with CSX and was hoping that the railroad would actually make good on its promise to build the floodgate, and therefore just didn't want to be a party to the lawsuit. I kind of understand how things work down in Robeson County a little bit, and I think I understand, but I sort of figured that, but I didn't want to, just on my own, I thought It sounds like you just don't know. I have an inclination, but I don't want to state that that is the case. No, no, don't do that. Let's stick with the law. Go ahead and proceed. Okay. So, we've got two contracts, we've got the one that is attached to the record, we have the second agreement that we haven't yet located in writing, but it is part of the state report where CSX has promised to build the permanent floodgate, and I'm going to lump those contracts together. Yeah, of course. Mr. Cash, if I could kind of get to a couple of specific things I wanted to know. I'm not going to ask you about the second contract, because to be honest with you, anyway, I'm just going to focus on the first contract. If you could, and if you need to come back with numbers in your rebuttal, this is fine, but I'd like, it looks to me like the paragraphs that arguably relate to the intent to benefit the third parties are paragraphs 63, 64, 200, 234, and 235, and I'll be glad to repeat those. This isn't a gotcha sort of thing, but if there are things I'm missing, I want you to repeat, please. Your Honor, I did not write down all of those, but if I can get to it this way, in our view, to look at the contract in isolation with the state, I believe our complaint does reflect that third party agreement was a necessary component of constructing the levee. The Jacob Swamp Improvement Plan was received in the late 60s. When you look at that plan, it's apparent that the levee would work if the gaps were filled in, so that was known on the scene all along. It was always the intent when the levee was designed to have the gate be closed. The contract was negotiated after the levee was completed, but it was on everyone's mind that this was going to have to be built. It was going to have to at least be the provision for a temporary burn across the levee, or it simply wasn't going to work. We certainly have evidence of that. We have documents from the Soil Conservation Service. We have reports showing that that was contemplated. There's a report from the Soil Conservation Service that shows the specific zone that would actually be protected by the levee, if the levee worked. So getting the real... I'm assuming from your answer to Judge Quaterbaughn's question, what you are now stating are in would show that benefit, the intended benefit here. If I'm understanding, Judge Quaterbaughn, he was trying to identify the specific areas in which you have... You say that this benefit arises so as to make it a third-party beneficiary. Well, and correct me if I'm misunderstanding that question, Your Honor, but the whole purpose of the system was to protect this defined zone, the South and West Plumberton area. The city memorializes that in the 1979 operational procedures where they talk about... But that's in every contract like this, isn't it? In every contract that comes up, the purpose is to protect somebody? And are you saying that in every case like this in which you've got specific areas, I mean, no matter what the city, usually when they enter the contract, it's probably not the entire city, it is probably aiming at a specific area or a primary area. You said in those cases, the residents or the people from there are always third-party beneficiaries in that contract and can bring it to the exclusion of the city and everybody else? No, not necessarily. I mean, the case law does make a distinction between the cases where there's a general contract that's designed to provide sort of general... Looks like you froze on me a little bit there. You might want to restate that. Restate what you just said. Okay. You're hearing me now? I'm sorry. Yes. So, there's a distinction I would make in the case law. The maternist case, for example, involves a contract involving interstate port, and the punitive third-party beneficiary claimants failed there because the court found that highway maintenance was just too general and too attenuated to where people were to permit them to enforce that contract. We believe our case falls into the other category of cases where utilities, like gas companies, like water companies, are providing a specific service to a specific area. And, therefore, those residents in that particular area do have standing, and I think it's the... Can I ask you a question about those cases in the way you just described them? Because this is something that I'm trying to wrap my head around. You just said these are cases where utilities are providing services to a specific set of residents, and so you would think those residents maybe have a right to enforce the contract. But this case is different, right? Because this isn't about the railroad company's services. In those cases, it's the gas company falls short of the services it committed to provide, and so I could understand why, in those cases, you might sort of construe third-party beneficiary status kind of generously, but the equivalent here would be if, like, the suit was that the rail... You know, for free, and then stop doing that. But this is not about the railroad's services. So it seems to me it falls a little bit outside those cases you're talking about, but I want to give you a chance to address that. Well, I think that's a fair point. I mean, this case doesn't involve the people of Lumberton trying to use the rail. But this is a case where the CSX specifically contracted to provide a flood protection service. It provided a license to the city, permitting the city to close the berm, close the rail line, and that was for a specific purpose, to benefit the people that were in that area. And so CSX did, you know, I think, well, this isn't exactly like Potter versus Carolina Water, for example, where the water company failed to provide water, and therefore, people's houses burned down because they couldn't get the water for fire protection. I think that's kind of the case you're getting at. Our case isn't exactly like that, but on the other hand, CSX did pick up this duty in the contract. And CSX and its predecessor did promise to avail, let the city avail itself of the ability to at least have a temporary berm, if not the permanent floodgate that was made in the second contract. So I guess, you know. Go ahead. Go ahead, Judge. Please. No, no, no, no. I'm good. Judge Qualabon, you got a question? Well, I was going to turn to a separate issue that I was looking at in the pleadings. I didn't see any allegations about direct and active dealings between the third-party beneficiaries and either party to the contract as it relates to this issue. Number one, do you believe that's a requirement for a contract like this one that doesn't name the third party as beneficiaries, and if it is a requirement, you know, did I miss it in the complaint? Your Honor, you did not miss it in the complaint because we do not believe that that is a requirement for third-party beneficiaries to demonstrate. And that test comes from the Hospira case, and Hospira does say that the presence of active and direct dealings between parties would be evidence of an intent to create standing, but it does not hold that you have to have those continuous and active dealings in order to establish third-party standing. And so we just think that CSX is misreading that case, and that's just not the law. So that's our view on that. We didn't intend to put that in the pleadings, and it's not there. I don't want to chew up all my time on the contract issues, but I want to make sure I'm not leaving anything to the side before turning to preemptive. I still want to return back just one little small point at the beginning, maybe just because I'm fuzzy on the procedure and what's going on here. It looks like to me something really wrong is going on, but I'm wondering, don't these plaintiffs, would they not have, other than sovereign immunity, I guess, couldn't they force the city to do something if they fail to carry out a contract for their benefit? And they say, well, you won't go and get the people for the very benefit you got for us? Is that not something that can be done there? Well, that's a possibility, Your Honor, but I believe that's a little outside the scope of our case here. I understand it's outside the scope of it, but I'm trying to get you to somewhere where you might get some remedy for it. So far you've got no remedy, but it seems to me that's the more direct way to deal with this. But if it exists, I mean, in terms of saying a city fails to do something that it's contracted to do and won't do it. At that point, you know, we've got all kinds of other means by which one can do it. Even the state of North Carolina might be able to get involved in it from the Attorney General's office where the city fails to carry out something it's supposed to do. But I'll let you move to preemption since I know you didn't come here to argue that. But I'll tell you right now, it's bugging me as to how it is that the city in which these people are a part of will not proceed against an entity for the benefit of this group of citizens. It's interesting to me, and now they have to come in and say, we are beneficiaries, and as beneficiaries, we can do something the city, which is a contract, who we are part of, won't do. But go to preemption. Go to preemption. Your Honor, just to respond, you know, I'd be reluctant to pass aspersions on the people who run the city of Wilmington or the health works director, and some of those questions kind of implicate the political process. I'd be reluctant to overstep my power. I'm just talking law. I'm talking law. Not in terms of whether or not sometimes politics, you know, we get into this thing about things being personal. It's not personal here at all. I'm talking about people who are trying not to have their places flooded. Yes, sir. I don't know. There is no politics in it to be. I understand people will be political, but, you know, you do what you. Go ahead and go to the next question. Yes, sir. Okay. So as you're aware, you know, our tort claims were dismissed on preemption grounds. And, you know, just getting straight to the heart of the matter, we believe it was error for the district court to grant the finding of federal preemption on a motion to dismiss. There was no evidence in front of the district court in which it can make that ruling. The Green Mountain test is, which says that tort claims are preempted only if they unreasonably manage or govern railroad operation. That's the binding test. In the fourth circuit, in the third, second, fifth circuits, the STB itself follows the Green Mountain test. And the district court blew past it by not permitting us to put in any evidence of our particular remedy and by, frankly, by not making CSX put in evidence of how exactly our preferred remedies would have interfered with its rail operation. Well, it interferes whenever you've got to close it up. If you've got to close it up, that interferes with the operation of it. Isn't that it? They all ask for the same kind of relief to have the railroad to change its operations. Well, I have several responses to that, Your Honor. So first of all, the thing that actually closed the line here was the flood. And you know, had a temporary burn actually been permitted to be built the way CSX agreed to in its contract, that would have actually preserved the railroad's ability to get back in business later. And there was no cost for the railroad to permit the temporary burn to be put in place. We were going to pay for that, or the city and the state were going to pay for that. There was an army of volunteers that wanted to pay for that. And there would have been no burden on railroading because there is no railroading going on in a flood. We put the picture of a flooded rail line in our pleadings for a reason. Secondly, as the STP has held, when a carrier actually commits to a desired remedy in a contract, that is very strong evidence that the remedy itself will not be a burden on railroading operations. And that's exactly what happened. In the third party, the tri-party agreement, CSX's predecessor said, yeah, if there's a flood coming, you can go ahead and build a burden across our line. It was wrong for the district court to then come in and overstep the covers. I'm sorry. I think that maybe I'm misunderstanding something about kind of the structure of your argument. I can see how questions about how burdensome this would be would be relevant to an implied preemption analysis. But are you saying that the state can expressly regulate railroad operations and unless there's some burden that the railroad can show, that's 100 percent fine? Because that was not my understanding. I thought that for express preemption, all that matters is, is the state effectively regulating railroad operations? I think we're probably saying the same thing here, Your Honor. The test is whether the remedy is going to unreasonably manage or govern. No, we're not saying the same thing. As far as I, as I had read the law, the unreasonable part of that is something we do when we're talking about implied preemption. If there's no actual express, direct, non-incidental regulation of the railroad, then we go on to say, okay, fine, this is just a general flood control measure. But we'll ask whether there's an unreasonable burden or interference. But if it's just the state saying, look, as a matter of state law, you got to shut down the railroad tracks 24 hours before every storm. That sure sounds like just express regulation to me, and I'm not sure the railroad has to show that it was burdened by that. In a case where, as here though, the railroad committed to doing that, I think you pretty much can skip that. Only if burden matters. I don't think that, um, the fact that the railroad sort of agrees to do it, it seems to me, I'll let this go in a minute, but I really am confused as to kind of what box we're in, express or implied preemption. Is it your position so that the state could, in fact, pass the law saying from now on, if there's a hurricane that's been forecast by NOAA, 48 hours before it's supposed to cross, we're shutting down the railroads. That would not be, um, preempted in your view? No, that is not, that is not. That would be preempted? I believe, I believe that, what, what, what takes- Okay. So how is that different from 48 hours beforehand, we're going to come put sandbags across your railroad line? I, I think the most obvious issue here is that the railroad agreed to let that happen. And I, and I would say that, um- Okay. What if the railroad doesn't agree? And I think they don't agree because they're right in the box next to you. Oh, if the, if the railroad hasn't already agreed in a contract, uh, to, to permit sandbagging, which is, which is not the case that we're in, and, and the state wants to pass a statute that just says we've declared these following standards for flood control in the future and they apply it specifically to railroads, I do believe that that would be preempted. I, I think you, I think you're convoluting contract and, and preemption. If, if you want to enforce the contract, the parties need to come to the table and do it. And you've already argued that part about it. Now we're talking about a preemption, uh, which from Judge Harris, uh, position when you're talking about the reasonableness that you're dealing with it, it's a totally different situation. If I, if I may briefly respond. Well, why don't, why don't we do this? Uh, your, your, your time is up for right now and you've got some time reserved, so, so that'll give you some time to think about it and then, uh, come back, uh, with, with, rather than off the top of your head, that might, you might like us better for that. How's that? All right. All right. So, so we're here for the other side a little bit. Good afternoon. Good afternoon. May it please the Court. April Ross on behalf of Via Pelli CSX Transportation. Your Honor, CSX is a private railroad company. Its business is the interstate freight transportation by rail. And the rail tracks at issue have run through Lumberton, North Carolina for over 150 years. A century after those tracks were built, the government built a stretch of Interstate I-95 running through Lumberton. I-95 sits on an elevated berm and has bridges where it intersects roads that pass underneath the highway. When the government built I-95 in Lumberton, the new highway happened to intersect the railroad tracks that had been there for a century and also a two-lane public road that runs adjacent and parallel to those tracks. What appellants refer to as the CSX gap is in reality simply the area beneath the highway bridge, including that road and the railroad tracks. You can see it in the drawing at Joint Appendix 68. It's about 90 feet wide, including the road, other land, and the tracks. Tracks cover roughly a third of that distance. CSX did not create this gap, did not choose its location. It's just a highway structure built by the government a century after the railroad tracks were laid. Your Honor, this case is about two historic natural disasters. And it's about... Let me ask you on that. You're saying it's not the railroad's gap, it's the state of North Carolina's gap? That's correct, Your Honor. It is simply that... So you're saying the state of North Carolina could close this gap if it wanted to? The state of North Carolina, Your Honor, could not close the CSX tracks on the gap because of the same issues we're talking about with regulation and preemption. They would not be able to halt the movement of trains. They could certainly close the road and other areas of that, but no, they would need permission from the railroad or from the Surface Transportation Board to dictate when trains can run through Lumberton, which is precisely... Well, tell me, just... I mean, let's go to the fundamental question here that kind of bugs me. Why wouldn't the railroad want to close that gap? You know it's going to flood that community over there, and it has. It caused great devastation. And I'm just puzzled as to why in the world wouldn't you work to not have this devastation? I mean, we're right in hurricane season now. I mean, in a moment now, one of these things could happen, and I've seen enough of what goes on in eastern North Carolina, that area down there, that this is real. And it is almost unbelievable that the railroad, when someone comes in a dire situation about to have their place flooded, and they said, oh, no, we're not going to do it. We're preempted. Oh, no, we're not going to do it. Because, you know, nobody else tells us to do it. Now, I agree, I'm miffed as to why the city of Lumberton and others don't jump in this, but you don't need to go there. We've already hashed that out, because that's going nowhere. But what is this about? I mean, is it just the operations that they've got the prerogative to do it? Your Honor, I think it's two things, and maybe more. But it's certainly the operation of the railroad, the need to continue to move freight, to move cranes, and sometimes that can involve the need to move freight and cargo outside of the area on the other side of what would be the barricade, and move that to a safe location. Which is part of the railroad's operational responsibilities. The second is that to do that places the railroad in the untenable position of deciding which area of Lumberton, for example, would be subject to flooding. But we are talking about a flood here. Let me just ask you, I always think about a case like this. There's no way you can get together the parties here and work this thing out? I mean, this does not look like a good public relations situation at all. I mean, it looks horrible to me in terms of what's going on, and I just don't know. I'm wondering why a company would not want to take at least some measures to help the situation. May not give them everything they want, but at least give them some comfort that, hey, when that flood comes through, it's not going to rush over and flood your property. Is there no opportunity for that here? Your Honor, as is alleged in the complaint and as reported in various media reports, the local governmental entities in the railroad have been talking for some time about coming up with a solution for this area. So you are working on a solution now. That's all I need to know. That you are thinking about it, other than just coming to the court and saying, we're not going to do it because we're not preempted. There is something going on here that we could possibly get a notice from you any day. We sat down and we put a couple of adults in the room and decided that we settled this matter here and everybody's going to be good. I'm not being facetious about it, you know, in the peers. I mean, I'm really concerned because of what this case. It looks really bad. I mean, it can't look good for the railroad at all. And I don't know. I don't know all that. I don't need to know all the other politics involved. I know there's something here, but it doesn't make any sense to me. Your Honor, my understanding is that there are discussions underway and have been for some time about a longer-term solution for this. The question, though, in this case is not really that. The question is one of enforcement of this 1978 contract by these appellants, and it's one of the use of state tort law to direct the running of trains and the building of tracks. Yes. Mr. Ross, just on that note, when you were referring, answering a question earlier, you talked about the objection really relating to the operation of the railroads. And I guess, you know, I understand that to some extent, but we've talked about the city a lot, and it's not a party. But, I mean, it doesn't sound like you are disavowing the contract. And the city, as a party to the contract, in theory, could have sought to enforce its rights under that contract. Is it your position that – I get the third-party beneficiary argument, so I'm not talking about that right now. But, I mean, the city had every ability to enforce it, or are you saying the contract somehow is null and void? Your Honor, well, the plaintiffs have alleged that there is a contract. I'm going to set aside the second contract for a moment because they – Yeah, me too. – have alleged that contract. With respect to the contract they have alleged, what that contract does is one thing. It's a limited licensing agreement from 1978 that it would allow the city to build an earthen dike on the railroad right-of-way. And if the city builds that dike, it would allow the city to extend the dike in the event of flood. Where does it say if the – I mean, I know your argument, and it sounds like that's that argument that you – it sounds more like a condition precedent argument. I understand exactly what you said, that the agreement gave the city the license to build the earthen dike. I didn't see a time period on that, and I didn't see the if it does so part of that contract. And so if I missed the if it does so part of that contract, if you should – you could point that out to me, I'd appreciate it. Sure. Your Honor, if you look at the Joint Appendix 27 in Clause 8A of the agreement, provides – I'm looking at it. – provides the city shall have the right of closing said dike across the track. The issue here, Your Honor, is in part that the dike was never built based on the court cited by the appellants in their complaint. The city never performed the original condition of the contract, and therefore CSX was never – You keep calling it original condition. I mean, you know, I suppose the plaintiffs are saying we were effectively sandbagging up the other portion of the gap, you know, or trying to do so at that time. I'm still having trouble with the condition as you describe it. I mean, it looks to me like those are separate rights and obligations under the contract. Your Honor, I disagree respectfully with that. I read the contract as allowing for the consideration of $1, access onto railroad property, to build a berm with very specific specifications laid out in the contract, as well as the attached drawings to that contract. And then if that berm is constructed, to allow the city to extend the berm in certain occasions. It doesn't require CSX to do anything, build anything, block anything, or protect anything. And, you know, we've talked about the third-party standing issue, but even if the plaintiffs had standing here, it doesn't require CSX to do what they would have CSX do in this occasion. But the issue really more fundamentally is that these plaintiffs do not have standing to enforce this contract. This is, as the Court surely knows, contracts are normally binding on and actionable by the parties to the agreement, and that there may be limited circumstances that give rise to third-party standing. But under North Carolina law, there is a strong presumption against third-party enforcement of contracts, and the contracts are strictly enforced against those non-parties. And here, what we're looking at is a government contract, which has an even stronger presumption against enforcement by members of the public. And as the North Carolina Supreme Court stated in the Materne's case, a third person cannot maintain an action upon a contract merely because it would receive a benefit from its performance, or because he was injured by the breach thereof. Every public contract by its nature has in mind members of the public who may benefit from performance of that contract. It does not mean that every member of the public in perpetuity would have the right to come to court and have standing to enforce that contract. And that's what we're talking about here. Yes. Let me, if I could follow up on that point. And your colleague mentioned earlier, I think, accepts that general principle. This type, this contract, though, appear, it appears obvious that the beneficiary, that to the extent the public would benefit, that it would be the people immediately, you know, adjacent to the area. So if you could respond to the distinction your colleague made earlier about, say, a new construction contract where the people who go over it would be maybe random or more random, and this where if it was to be built, I get the pleading deficiencies. I'm not sure this ultimately matters because I'm not sure if it's pled or not. But it just, I wonder whether, you know, this, a contract like this requires that level of Your Honor, I think it does. It doesn't require necessarily the naming of Mr. Jimmy Edwards, for example. But what we have here is a very amorphous definition of the class of persons that would be protected by this contract. And it appears by appellant's position to be anyone in the south or western part of Lumberton at any time, living there, working there, moving into that area decades after the contract has been signed, who would then apparently have standing to come and enforce this. And when we look at North Carolina law on third-party beneficiary status, what we see is the court repeatedly finding no third-party beneficiary status in cases where there is a much closer relationship there between the parties. So, for example, in the Hull Shower case, the Court of Appeals found no third-party standing for an assaulted employee of a hotel who sought to enforce the contract between the hotel operator and the security company who was intended to protect her while on the premises. In the Vogel v. Reed supply case, we have the North Carolina Supreme Court finding no third-party standing for a landowner who sued the subcontractor because any benefit to the landowner would accrue indirectly through the general contractor. And here that's what we have. Any benefit to the members of Lumberton or the residents of Lumberton at most would accrue indirectly through the city, not through CSX. So there is no standing to sue CSX to enforce this contract, which plaintiffs do not have a direct beneficiary relationship to. Your Honor, I want to make sure I've answered your questions on the contract, but I would like to make sure I have time to address the preemption questions. I would quickly like to touch on the public utility argument first, only with respect to the contract, because I do think, as Your Honors pointed out and as Judge Harris pointed out, there is a significant difference between a railroad running a freight operation and a public utility providing service specifically for the residents of the community. Here, CSX's business is running trains, not providing services to these people. So turning then to the TOR claims, what appellants seek in this case is to have the district court dictate when, under state law, trains can run, when the tracks need to be barricaded, both temporarily or with a permanent structure, to require CSX to build a permanent structure that would cross its rail tracks and be used in times of flooding, and to require CSX to rebuild its tracks using a different and less porous material. The court concluded below, on the face of the complaint, that that will interfere with railroading. It requires the digging up of tracks, the building of structures, the changing of materials, the stopping of trains. This is the core exercise of the Surface Transportation Court. And 25 years ago, Congress vested this. Yes? I think you make some good points to a lot of the claims for relief that are alleged. But one of the claims is just to allow the city to come in and sandbag the area of the right-of-way. And that's a, that relief, you know, appears to be generally consistent with the contract that's, the tri-party contract that's been pledged. Which, on that relief alone, given that you, that there's, you know, at least an allegation that you've agreed to that relief in contract, can that be preempted, can that, is that preemption if you've already agreed to it? Your Honor, yes, with respect to the tort claim. We don't, we don't take the position that the contract claim is preempted, and this court addressed that issue in the PCS phosphate case with respect to private agreements. But with respect to a tort claim that seeks to require CSX to allow barricades to be put on its tracks, to use state negligence law to enforce that, yes, it's our position that that is preempted because it interferes with railroading. And, Your Honor, this case is not unprecedented. This case is precisely the same as the Katrina case from the Eastern District of Louisiana, which was dismissed on the pleadings. And that case, like this, involved a devastating flood following a major hurricane. It involved local residents suing CSX, where CSX's tracks intersected with the city's levy system, claiming that the materials that CSX used and the way that it conducted its operations increased or led to the flooding of the Lower Ninth Ward in New Orleans. There, Judge Duvall found both that a railroad does not have a duty to protect the public from natural disasters, but also that those claims are preempted by the Interstate Commerce Commission Termination Act. And the Per Marquette case reached the same decision. And I refer the court to the Iowa Supreme Court's decision in Griffion v. Rapids, which very nicely summarizes the law on the Interstate Commerce Commission Termination Act and flood-related preemption. I do want to touch, to make sure I have time to touch briefly, on a couple of Surface Transportation Board decisions that appellants have latched onto and claim support their claims here. In particular, the Holly Acres-related decisions. These are two decisions issued by the Surface Transportation Board in a case involving CSX and flooding of a mobile home park in Woodbridge, Virginia. There, the Surface Transportation Board, despite what appellants say about these cases, did not find that the claims were not preempted. What the board found is that it did not have enough information about the underlying lawsuit and elected not to rule on that issue. And also noted that the law on ICTA preemption is clear and well settled and could be applied by the court. Citing, for example, to the Katrina case, the Per Marquette case, the other cases that we've cited in our brief. And in Holly Acres, the board issued guidance to be used by the state court in determining whether preemption applies. And according to the Surface Transportation Board, the ICCTA prevents state or localities from imposing requirements that by their nature could be used to deny a railroad's right to conduct rail operations or proceed with activities the board has authorized, such as construction. Orders to barricade tracks, build temporary and permanent structures on the tracks, or change the materials that support the tracks plainly fall into that category. And the other thing that the appellants leave out about the Holly Acres case is the end of the story. Once those cases were returned to the Prince William County Circuit Court, the court granted CSX's plea in bar, finding all claims were expressly preempted by the ICCTA. The plaintiffs attempted to appeal that to the Supreme Court of Virginia, which found no reversible error in the judgment. So that decision certainly does not help appellants and simply reinforces the reach of preemption in this case and its application to these claims. Your Honor, at its core, this is a case about whether the railroad is responsible for blood protections in time of natural disaster under state law. It's not. These appellants do not have standing to enforce this 41-year-old agreement. The contract is before the court and was before the court below. The complaint pleads no facts supporting third-party beneficiary standing. The contract does not support third-party beneficiary standing. And while the public might benefit from this agreement, that does not give rise to legal standing under North Carolina law. And even if they did have standing, the contract does not require CSX to do the things the appellants say CSX should have done. With respect to their tort claims, those claims directly implicate areas of rail construction, maintenance, and operation, the building of tracks, the blocking of tracks, the shutting down of train operations. Twenty-five years ago, Congress vested exclusive jurisdiction in the Surface Transportation Board for those matters, not in state court and not under state law. Courts routinely dismiss claims like these on the pleadings, whereas apparent from the face of the complaint, they cannot proceed. There's no additional information, discovery, or fact development that's needed on these issues. It's apparent from the pleadings and the documents incorporated in the complaint that this complaint was properly dismissed below. Therefore, we ask that the court affirm the district court's ruling. Thank you. Ms. Ross, judges, do you have any further questions? All right. Then, Mr. Cash, you have just a few minutes for rebuttal if you choose to use it. Yes, sir, and I thank you. First off, Judge Quattlebaum, I tried to find the paragraph numbers that I thought would support what you're looking for. If it's all right, I'd like to give you my list of numbers back. I'd go with 26, 46 through 59, 63 through 68, 183, 234, and 235. Thank you. Sure. With respect to Judge Harris's question on preemption, I guess I'd like to pick up with the Holly Acres decision as well, which I think is a good roadmap for this case. We treated it carefully in our briefs. CSX was being sued in state court. It didn't think that it would get its preemption finding in state court, so it went to the STB as an end run around the judicial process. My colleague is correct that it sets out a good roadmap, but I think when you look at the decisions, it's clear the STB expressly considered there could be a construction remedy at issue in the case. The STB expressly declined to find express preemption on the pleadings, on the facts presented there, even though the plaintiff was seeking a construction remedy. I think the key thing in both of those decisions, when CSX lost the first time and lost the second time, is in both instances, the board said the ultimate preemption finding would have to turn on the facts and circumstances of the case. It cited the Green Mountain test, by the way. That is consistent with our argument, not theirs, that you need to look at the facts and circumstances. You need to have evidence and information about whether the remedy really would disrupt rail operations or whether it would be incidental. There hasn't been evidence in this record as to whether the building of a temporary berm would stop a single train in the event of a hurricane, nor is there any evidence that the construction of a permanent floodgate could or could not be done without interfering with rail traffic. We've been doing construction on active rail lines for about two centuries. It is possible to do that without interfering with rail traffic. Even if it did, the law is that the interference has to be not unreasonable. To protect these thousands of poor residents and to reserve hundreds of millions of dollars in damage, as the state report found, it might not be unreasonable under the analysis to stop a train here or there. But that should have been tested in the district court and not blown past on the pleadings. With respect to whether this is done on the pleadings or not, even CSX in their briefing said it's routine. But we cited the Massachusetts case pointing out that it is very rarely done and the great majority of these decisions are made on a factual record, not made in a vacuum. So respectfully, I see I'm out of time. I want to ask this panel to affirm, to reverse the decision below, reinstate all of the claims and let this case go forward. I thank you. All right. Thank both of you. Thank you for your arguments. And as I said, we're unhappy we cannot come down and personally greet you, but you get a nice wave from me. How's that? Be safe out there. Thank you very much. Court's going to stand at recess for just about five minutes or so before we proceed to our final case of the day.
judges: James A. Wynn Jr., Pamela A. Harris, A. Marvin Quattlebaum Jr.